[Cite as *In re X.R.*, 2026-Ohio-2828.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE X.R. | : | |
| | | No. 115955 |
| A Minor Child | : | |
| | | |
| [Appeal by Father, A.W.] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 23, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-24-909172

---

### *Appearances:*

Gregory T. Stralka, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

TIMOTHY W. CLARY, J.:

{¶ 1} Appellant-father A.W. ("Father") appeals from the juvenile court's judgment terminating his parental rights and granting permanent custody of his minor child X.R. (d.o.b. 9/21/2021) to appellee, Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

**Factual and Procedural History**

{¶ 2} The underlying case was initiated following an August 2024 domestic-violence incident that took place between X.R.'s mother, C.H. ("Mother"), and her then-husband S.B.S., while the children were present.[1] During this incident, Mother was playing with her children on a bed in a hotel room when S.B.S. jumped on the bed, landing on Mother and X.R. and resulting in X.R. having a mark on his face. X.R. was removed from Mother's custody on September 6, 2024, pursuant to an ex parte order. On September 9, 2024, the agency filed a complaint for abuse, neglect, and temporary custody, alleging that X.R. and Mother were injured by S.B.S. The complaint alleged that Mother lacked the appropriate decision-making skills to provide for the safety of her child and that Mother refused to take appropriate measures and to make alternative arrangements for the continued safety of the child. With respect to Father, the complaint alleged that A.W. had failed to establish paternity and was unable to provide care for the child at that time.[2] The agency also filed a motion for predispositional temporary custody.

{¶ 3} The court held hearings on September 9 and September 10, 2024. At the September 9 hearing, agency intake worker Zoe Germana ("Germana") testified that when the agency received the referral in this case, Germana and another agency

---

[1] Mother has four children, including X.R. Prior to the incident that precipitated the complaint in this case, CCDCFS had been involved with the family due to allegations that L.H., Mother's oldest child, had sexually abused another one of Mother's children, D.H. Mother has a companion case, *In re X.R., et al.*, 8th Dist. Cuyahoga No. 115920, related to X.R. and L.H. The instant appeal only involves X.R.

[2] At the time the complaint was filed, X.R.'s paternity was unknown. A.W., another individual, and John Doe were identified as "alleged father" in the initial complaint.

worker went to Mother's home, observed the children, had a conversation with Mother, and scheduled a staffing. Prior to that staffing, Mother drove X.R. and her two middle children to Michigan and reported to the agency that they were with her mother ("maternal grandmother.") According to Germana, the following week, the agency contacted Children and Family Services in Michigan "to attempt to verify that the children were safe" and learned that the two middle children were not with maternal grandmother but were instead with Father's fiancée. (September 9, 2024 hearing tr. 10.) In the meantime, Mother returned to Michigan to get X.R. from maternal grandmother and bring him back to Ohio. According to Germana, Mother allowed her two middle children to stay in Michigan and "said that she would allow Father to file for custody of the children . . . but was not willing to let [X.R.] stay with Father." (September 9, 2024 hearing tr. 12.) Germana testified that Mother's two middle children were safe in Father's care.

{¶ 4} Germana testified that the agency believed that Mother minimized the domestic-violence incident involving X.R. and therefore there was an immediate risk to X.R.'s health and well-being if he remained in Mother's custody. The court granted the agency's motion for predispositional temporary custody.

{¶ 5} On September 12, 2024, the court appointed a guardian ad litem ("GAL") for X.R.

{¶ 6} On October 4, 2024, the agency filed a case plan; the certificate of service reflects that the case plan was sent to Father, but the case plan did not

include any additional mention of Father, who at that point had not established paternity.

{¶ 7} On November 18, 2024, the court held an adjudicatory hearing. Relevant to this appeal, the court heard testimony from Germana that she had spoken with Father and he had expressed interest in being involved with X.R. once paternity was established.

{¶ 8} Kayleen Harrah ("Harrah") testified that she was the supervisor in the agency's ongoing sex abuse unit and was assigned to X.R.'s case. Harrah testified that with respect to Father, the only case plan service was to establish paternity, and Harrah was informed that Father "was in the process of getting swabbed for that." (November 18, 2024 hearing tr. 31.) Harrah further testified that Father had informed the agency that he would like to be involved and establish visitation with X.R. once paternity was established. Harrah testified that while the agency had not done any visits with Father, Michigan's Children and Family Services agency had done visits with Father and paternal grandmother. Relevant to this appeal, at the conclusion of the hearing, the court sua sponte amended the agency's complaint to delete the allegation that Father was unable to provide care for the child at the time. Following this hearing, on December 4, 2024, the court adjudicated X.R. abused and neglected and committed him to the temporary custody of the agency.

{¶ 9} On July 17, 2025, the agency filed a motion for first extension of temporary custody. On August 27, 2025, the agency filed a motion to amend its dispositional prayer from a first extension of temporary custody to permanent

custody. The agency attached an affidavit from a case worker to the motion that averred that Father had failed to establish paternity and had failed to support, visit, or communicate with the child for a period of greater than 90 days.

{¶ 10} The record reflects that the court held a "Review Hearing" on August 28, 2025. The corresponding journal entry states that Father and his counsel made their first appearance in the case, and Father's case plan services were to establish paternity, establish a relationship with X.R., and be assessed for services.

{¶ 11} On September 10, 2025, the agency filed a case plan that stated that the permanency goal for X.R. was reunification and further stated that the agency was exploring a placement with relatives in Michigan. Father was identified in the case plan as an alleged parent, and the case plan stated that Father had not established paternity "or made intentions know [sic] to agency regarding [his] wish to visit or have care and custody of [X.R.]" The case plan stated that Father was "aware" of which agencies in Michigan to reach out to in order to establish paternity and was aware of the agency caseworker who could coordinate his visitation with X.R. Finally, the case plan stated that Father should contact the Child Support Enforcement Agency ("CSEA") and cooperate with the establishment of paternity and reach out to the agency worker to establish visitation.

{¶ 12} On September 19, 2025, the agency filed an amended case plan. The modifications related to L.H.'s placement; the goal for X.R. remained reunification. Following a request from Father's counsel at a September 22, 2025 hearing, the

court ordered CSEA to administer DNA testing to Father upon Father's presentation at a CSEA facility.

{¶ 13} The record reflects that Father established paternity of X.R. on October 21, 2025.

{¶ 14} On November 4, 2025, the court held a dispositional hearing on the agency's motion for permanent custody of L.H. and X.R.[3]

{¶ 15} At this hearing, agency worker Re'gine Wells ("Wells") testified that Father "made himself aware to the Agency in August 2024" when X.R. was first placed in the agency's custody, but after that, Father "did not maintain contact or cooperation with the Agency until" September 2025. (Nov. 4, 2025 hearing, tr. 26.) Wells testified that Father lived in Michigan and informed the agency that he was involved with Michigan Children and Family Services and provided her with the name of the worker he was involved with for ongoing services. Wells testified that she was unable to contact anyone at Michigan Children and Family Services. Wells testified that Father's case plan services were "[t]o establish paternity and make himself available to the agency to reassess for any additional needs." (November 4, 2025 hearing tr. 25.)

---

[3] Immediately prior to the dispositional hearing for both children, the court held an adjudicatory hearing with respect to L.H., who is not a subject of this appeal. Testimony and evidence submitted during L.H.'s adjudicatory hearing was incorporated into the dispositional hearing without objection.

{¶ 16} With respect to paternity, Wells testified that after X.R. was placed in agency custody in August 2024, the agency instructed Father to establish paternity. Wells testified that Father was swabbed to establish paternity in September 2024.

{¶ 17} Wells also testified that she had discussed a visitation schedule with Father and Father reported that he could possibly come to Cuyahoga County for visits once a month to establish a relationship with X.R. According to Wells, the day before the first scheduled visit, Father contacted the agency and reported that he could not make it to Cuyahoga County for the visit and asked that the visit be moved to a virtual visit. According to Wells, the next day, Father did not appear for the virtual visit and has not otherwise kept in contact with the agency since then. It is not clear from the record when the scheduled visit was to take place.

{¶ 18} Wells further testified that Father reported that he lived in a three-bedroom house with eight other occupants; according to Wells, the agency considered this inappropriate.

{¶ 19} Wells testified that X.R. was placed in a foster home at the time of trial, and this was his third foster placement since the beginning of the case. She further testified that X.R.'s paternal grandmother had communicated a willingness to care for X.R., and the agency began an investigation into her home; that investigation was still pending at the time of trial.

{¶ 20} When asked if she had additional concerns as to Father, Wells testified as to the "concern that [Father has] an open Michigan case for ongoing

services, unsure what those services are to address because I can't get in touch with anyone there, but he has an open case." (Nov. 4, 2025 hearing tr. 76.)

{¶ 21} Wells testified that she did not believe either parent had made significant progress toward completion of their case-plan services or shown a benefit from those services. Likewise, Wells testified that she did not believe that either parent could provide a safe, stable, and permanent home for X.R.

{¶ 22} Mother called three witnesses to testify on her behalf; their testimony is not directly relevant to the instant appeal. Father did not testify on his own behalf or otherwise call any witnesses.

{¶ 23} The GAL placed her recommendation on the record, stating:

[X.R.] says that he does want to live with his mom. He says mommy. He's very young. I don't think he fully understands, but he shows a very, very strong bond with his mom and mother shows a very strong bond with him.

And I do want to just say that I did a video visit with father and paternal grandmother and both of their homes are appropriate.

Father has I believe, and he would have testified to this, that he has eight children in his home, one child and seven kids, so it's too many kids in the home to take on another child, but he has support of paternal grandmother potentially for placement.

And as indicated by all the testimony, it seems like there's ample amounts of relatives that could potentially have placement of the child if need be other than mother.

I just do not believe that permanent custody in both cases is best for the children at all, particularly because the person that inflicted the violence in August has had an opportunity to get his kids back with temporary custody, so I believe that mother should have an opportunity to work on her case plan objectives and get her kids back.

(Nov. 4, 2025 Hearing tr. p. 174-175.)

{¶ 24} On November 21, 2025, the trial court granted the agency's motion for permanent custody and terminated the parental rights of Father and Mother. In its journal entry, the court made the following findings relevant to Father's appeal:

The Guardian ad Litem recommends that extending Temporary Custody is in the Child's best interest.

The Court finds by clear and convincing evidence that pursuant to O.R.C. 2151.414(B)(1):

(a) The child is not abandoned or orphaned or has not been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period, if as described in division (D)(1) of section 2151.413 of the Ohio Revised Code, the child was previously in the Temporary Custody of an equivalent agency in another state, and the child cannot placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

With respect to the best interest of the child, the Court has considered the following factors under O.R.C. 2151.414(D)(1):

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers and out-of-home providers, and any other person who may significantly affect the child.

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *The child is too young to express his wishes. GAL recommends an extension of temporary custody.*

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period. *The child has been in Agency custody since September 2024.*

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of

permanent custody. *The child deserves a safe and stable home environment where his needs can be met and he can thrive. This cannot be achieved with Mother as she has failed to remedy the cause for removal in order to provide a safe home for the child. The child came into Agency custody after a domestically violent incident between mother and husband. The child was adjudicated abused as a result of the incident and the Court found that mother and the child were injured during the incident. Mother continues to lack appropriate decision making in order to provide for the safety of the child as mother allowed her brother and his family to move into her home, after being told not to by CCDCFS. Videos submitted during trial show very concerning and abusive behavior at the hands of mother's brother. The child's sibling was living in the home when the incident occurred. Mother's brother and his wife had their children removed due [to] the incident (the children were adjudicated abused, neglected, and dependent) and the brother and his wife are currently facing criminal charges as a result of the incident. (Exhibits 6, A, B, and E). The court does not find that mother displayed appropriate decision making during the incident as evidenced on the video (Exhibits 7 and G). Father does not have the ability to care for the child. No one else has been identified as willing and appropriate to care for the child.*

(e) Whether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child. *(E)(10) applies to father.* The Court finds by clear and convincing evidence that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, pursuant to O.R.C. 2151.414(E):

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. *While mother has engaged in and completed some case plan services, she has not benefitted and continues to make inappropriate decisions.*

(4) The parent *(Father and Mother)* has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home

for the child.  *Mother's decision making and inconsistencies in visitation with the child.*
(10) The parent (Father) has abandoned the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse of physical, emotional, or mental neglect.  *Mother continues to have domestically violent incidents in her home, which the child's sibling was exposed to.*

(16) Any other factor the Court finds relevant: Mother has two other children who were removed from her care by CCDCFS and placed with maternal grandmother in Michigan through a safety plan. Grandmother violated the safety plan by giving the kids to their father in Michigan, where the children remain today.  The serious nature of the abuse on this child, as well as the continued exposure to abuse in the home, makes the child's placement with the mother a threat to the child's safety.

The Court finds that the Mother and Father have *not* made significant progress on the case plan, as required by ORC 2151.415(D)(1) and therefore a first extension of temporary custody cannot be ordered and would not be in the best interest of the child.  Furthermore, there is not reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of the extension.

The child's continued residence in or return to the home of [Mother] would be contrary to the child's best interest.

The Court further finds that reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification.  Relevant services provided to the family include: Mother: Domestic Violence, Mental Health, Parenting, Housing/Basic Needs. Father: make himself available to the Agency.

(Emphasis in original.)

{¶ 25} Father appealed and raises two assignments of error for our review:

I. The decision of the trial court granting permanent custody was not supported by sufficient evidence.

II. The decision of the trial court granting permanent custody was against the manifest weight of the evidence.

**Law and Analysis**

{¶ 26} Under R.C. 2151.414(B)(1), a juvenile court may grant a public children-services agency's motion for permanent custody if it determines, by clear and convincing evidence, that permanent custody is in the best interest of the child and, as it applies to this case, "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a).

{¶ 27} "'Clear and convincing evidence' is that 'measure or degree of proof' that 'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph two of the syllabus.

{¶ 28} A juvenile court's decision to grant permanent custody of a child to CCDCFS is reviewed under sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review depending on the nature of the arguments presented. *In re L.W.*, 2026-Ohio-2415, ¶ 22 (8th Dist.), citing *In re Z.C.* at ¶ 11 and *In re T.W.*, 2026-Ohio-124, ¶ 44 (8th Dist.). Here, Father contends that the trial court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 29} A sufficiency review involves a question of law, and in undertaking a sufficiency review, this court's should affirm a trial court judgment if the evidence is

legally sufficient to support the factfinder's judgment as a matter of law. *In re Z.C.* at ¶ 13. For a review of manifest weight, however, this court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.).

{¶ 30} In his first assignment of error, Father argues that the trial court's judgment was not supported by sufficient evidence. In support of this argument, he asserts that the trial court's findings that (1) Father had demonstrated a lack of commitment toward X.R. by failing to regularly support, visit, or communicate with X.R. and (2) Father abandoned X.R. were contrary to the evidence presented at trial. Specifically, Father argues that trial testimony reflected that X.R. was living with him, or otherwise in his care, in Michigan, during the pendency of the case. This is not an accurate characterization of the record.

{¶ 31} The record reflects that in the brief period between when the agency received a referral related to the domestic-violence incident involving X.R. and when the agency filed its complaint in this case, Mother took her three youngest children,

including X.R., to Michigan. The record further reflects that pursuant to a safety plan, Mother told the agency that the children were with maternal grandmother. When CCDCFS attempted to verify the children's location, it learned that X.R. was with maternal grandmother, but the other two children were with Father.

{¶ 32} Father asserts that the children were living with him with agency approval. While the record reflects that Mother's two middle children continue to reside with Father in Michigan, and the agency is aware of that, nothing in the record indicates that those two children have been involved with the agency beyond their inclusion in the aforementioned safety plan that was in place prior to the complaint being filed in this case. Moreover, the record reflects that the middle children being with Father instead of with maternal grandmother was contrary to the safety plan and, therefore, explicitly without CCDCFS approval.

{¶ 33} Additionally, Mother brought X.R. back to Ohio at the outset of this case, and the record reflects that he has been in foster placements for the pendency of the case. We note that the testimony in the record as to exactly how and when the children came to be in Michigan is ambiguous; further, testimony from agency workers throughout the pendency of the case contains contradictory statements as to the agency's ability to verify information related to the children's whereabouts or safety in Michigan. Notwithstanding this ambiguity, the record does not reflect that X.R. was living with Father during the pendency of this case.

{¶ 34} For these reasons, Father's argument that the trial court's finding was not supported by sufficient evidence is not well-taken. Father's first assignment of error is overruled.

{¶ 35} In Father's second assignment of error, he argues that the trial court's decision was against the manifest weight of the evidence. Specifically, Father argues that he had completed both of his case-plan objectives and, therefore, the court clearly lost its way and created a manifest miscarriage of justice when it terminated his parental rights.

{¶ 36} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors in R.C. 2151.414(B)(1)(a)-(e) exists and that permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 37} Regarding the first factor, here, the juvenile court found by clear and convincing evidence that R.C. 2151.414(B)(1)(a) applied, which provides in relevant part, that "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

{¶ 38} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re K.L.*, 2026-Ohio-266, ¶ 26 (8th Dist.), citing *In*

*re K.G.*, 2026-Ohio-127, ¶ 14 (8th Dist.). If any one or more of the R.C. 2151.414(E) factors are found by clear and convincing evidence, the court "'*shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.'" (Emphasis added.) *Id.*, quoting R.C. 2151.414(E) and *In re J.S.*, 2022-Ohio-4517 (8th Dist.).

{¶ 39} Here, the juvenile court found by clear and convincing evidence that X.R. could not be placed with Father within a reasonable time or should not be placed with Father, based on findings pursuant to R.C. 2151.414(E)(4) and (10), which provide:

> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
> . . .
>
> (10) The parent has abandoned the child.

{¶ 40} Our review of the record reflects that the juvenile court's findings are supported by clear and convincing evidence and thus are supported by the weight of the evidence.

{¶ 41} Specifically, the juvenile court's finding that Father has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child was undisputed. Likewise, "[a] child is 'presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.'" *In re K.L.*, 2026-Ohio-266,

¶ 34 (8th Dist.), quoting R.C. 2151.011(C). Here, the record shows that Father did not visit X.R. throughout the pendency of this case as described above. Father did not present anything to rebut the presumption of abandonment.

{¶ 42} Father is correct that he successfully completed one of his two case-plan goals — establishing paternity — prior to trial. With respect to the second case-plan goal, however, the record does not reflect that Father successfully established a relationship with X.R.

{¶ 43} Father has not raised an argument on appeal specifically challenging the juvenile court's best-interest determination under R.C. 2151.414(D)(1). Accordingly, that finding will not be addressed.

{¶ 44} We are cognizant of the fact that Father satisfied one of his case-plan goals, the record reflected that he had some interest in establishing a relationship with X.R. in furtherance of his other case-plan goal, and the GAL recommended that an extension of temporary custody was in X.R.'s best interest. While compelling, none of these factors negates the statutory obligation of the juvenile court to find that X.R. could not be placed with either parent within a reasonable time or should not be placed with either parent in accordance with R.C. 2151.414(E). Further, this court has previously stated that "'a trial court is not bound to follow a guardian ad litem's recommendation.'" *In re A.M.*, 2026-Ohio-1977, ¶ 44 (8th Dist.), quoting *In re M.W.*, 2017-Ohio-8580, ¶ 24 (8th Dist.).

{¶ 45} For these reasons, the juvenile court's judgment was not against the manifest weight of the evidence. Father's second assignment of error is overruled.

**{¶ 46}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIMOTHY W. CLARY, JUDGE

MICHAEL JOHN RYAN, P.J., and
DEENA R. CALABRESE, J., CONCUR